J-S23009-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| QUINCY SCOTT MARKS | : | |
| | : | |
| Appellant | : | No. 2485 EDA 2023 |

Appeal from the Judgment of Sentence Entered August 23, 2023
In the Court of Common Pleas of Montgomery County
Criminal Division at No: CP-46-CR-0002113-2020

BEFORE: STABILE, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY STABILE, J.: **FILED JANUARY 14, 2026**

Appellant, Quincy Scott Marks, appeals from the August 23, 2023, judgment of sentence imposing an aggregate four to eight years of incarceration followed by four years of probation for unlawful possession of a firearm (18 Pa.C.S.A. §§ 6105(a)(1) and 6106(a)(1)). We affirm.

On March 6, 2020, the Borough of Pottstown Police Department conducted surveillance on a local Motel 6. The motel was known as a hot spot for drug activity. Police had information from a confidential informant that Toby Raffle, who had an outstanding bench warrant, was staying at the Motel 6 and dealing drugs. Police observed Raffle and Appellant in a car together in the motel parking lot early that morning. Throughout the day, police observed Raffle engaged in suspected drug activity using either a silver Kia or a maroon

Nissan. Police followed Raffle when he drove the Kia to what turned out to be a meeting with another known drug trafficker.

In the evening, after dark, police observed the Kia and Nissan return to the motel after having been away for some time. They had determined by that time to take Raffle into custody upon his return to the motel. Police approached both vehicles with flashlights, as the parking lot was not well lit. Raffle was not in either of the cars at that time, but Appellant was in the passenger side rear seat of the Nissan. Upon the officers' approach, Appellant made furtive movements and was visibly having difficulty breathing. When an officer asked Appellant if he was armed, Appellant opened his mouth but was unable to speak. Police then ordered Appellant out of the car, patted him down, and retrieved a .40 caliber handgun from Appellant's right hip. Police took Appellant into custody because he had a prior conviction and was prohibited to possess a firearm. Appellant did not have a concealed carry license, and the .40 caliber handgun turned out to be stolen.

Appellant filed a pretrial motion to suppress evidence on October 2 2022,[1] asserting that the search that revealed the handgun was unlawful. Appellant failed to appear for the hearing scheduled on October 20, 2022, and also failed to appear for a jury trial scheduled for October 26, 2022. The trial court issued a bench warrant, and Appellant was detained on November 22,

_____

[1] Because Appellant was arrested in 2020, the COVID-19 shutdowns resulted in substantial delays in the processing of his case.

- 2 -

2022.  The trial court conducted a hearing on the suppression motion on February 9, 2023.  After the trial court denied the motion, the parties proceeded to a stipulated bench trial on March 28, 2023.  The trial court found Appellant guilty of violating § 6105(a)(1) and § 6106(a)(1).  The trial court sentenced Appellant to four to eight years of incarceration followed by four years of probation on the former, and a concurrent three to six years of incarceration on the latter.  Appellant did not file a post-sentence motion.  This timely appeal followed.  Appellant's only argument is that the firearm should have been suppressed because he was subjected to a custodial detention and a search without probable cause.  Appellant's Brief at 6.

> [O]ur standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*.  Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted.  Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

*Commonwealth v. Yandamuri*, 159 A.3d 503, 516 (Pa. 2017) (citations omitted).

We recognize three forms of interaction between police and citizens: a mere encounter, an investigative detention, and a custodial detention. *Commonwealth v. Spence*, 290 A.3d 301, 314 (Pa. Super. 2023).

A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond.

In contrast, an investigative detention, by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity. In further contrast, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest.

*Id.* at 314 (quoting ***Commonwealth v. Jones***, 874 A.2d 108, 116 (Pa. Super. 2005)). An investigative detention requires reasonable suspicion. That is, "a police officer must be able to point to specific and articulable facts leading him to suspect criminal activity is afoot." ***Commonwealth v. Holmes***, 14 A.3d 89, 95 (Pa. 2011). We discern the presence of reasonable suspicion in light of the totality of the circumstances, and we must "afford due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience and knowledge and acknowledge that innocent facts, when considered collectively, may permit the investigative detention." ***Id.***

A pat down search in tandem with an investigative detention also requires reasonable suspicion:

Review of an officer's decision to frisk for weapons requires balancing two legitimate interests: that of the citizen to be free from unreasonable searches and seizures; and that of the officer to be secure in his personal safety and to prevent harm to others. To conduct a limited search for concealed weapons, an officer must possess a justified belief that the individual, whose

- 4 -

suspicious behavior he is investigating at close range, is armed and presently dangerous to the officer or to others. In assessing the reasonableness of the officer's decision to frisk, we do not consider his unparticularized suspicion or hunch, but [rather] ... the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."

***Commonwealth v. Zhahir***, 751 A.2d 1153, 1158 (Pa. 2000). In ***Zahir***, as in the instant case, the police were investigating drug trafficking. The defendant met the description provided to police by an informant, and he abandoned an item when he first saw the police. Upon the approach of police officers, the defendant turned toward them with his left hand in his pocket. A police officer, concerned for his safety, grabbed the defendant's left hand and patted down the pocket, finding vials of crack cocaine. ***Id.*** at 1155-56. Our Supreme Court held that the pat down was lawful. ***Id.*** at 1158.

Instantly, the trial court found, based on the facts summarized above, that police had reasonable suspicion to detain Appellant and pat him down for weapons. Our own review of the record reveals that the record supports the trial court's findings. The Commonwealth presented two witnesses at the suppression hearing—Seargeant Edward Kropp, of the Borough of Pottstown Police Department, and Detective James Lavin, of the Montgomery County Detective Bureau. Seargeant Kropp had 14 years of experience as a plainclothes police officer investigating drug trafficking in Pottstown. N.T. Suppression, 2/9/23, at 5. Detective Lavin had been in law enforcement since 2006, and with the Montgomery County Detective Bureau since 2018. ***Id.*** at

26. The Motel 6 under surveillance was one of the most common drug transaction areas in Pottstown. *Id.* at 9, 30.

During surveillance, police observed several telltale signs of illicit drug activity. Raffle met with another known drug trafficker at the Motel 6 during surveillance. *Id.* at 11. Likewise, Appellant and Raffle were seen together early in the morning. *Id.* at 16, 39, 47. Raffle picked up an unidentified person in a Silver Kia and drove them to a nearby gas station by a circuitous route before dropping the person off. *Id.* at 11, 34. Sergeant Kropp explained that quick pickups and drop are consistent with drug transactions:

> [D]rug traffickers will often get someone in their car, literally drive around the parking lot or just around the block and drop the person back off in the exact same location they picked them up, and that's done to keep law enforcement from observing the totality of their interactions to not see the actual exchange. They'll literally just pick them up and drive them down the street and drop them off.

*Id.* at 9. Police also learned in the late morning during surveillance that Raffle had an outstanding bench warrant for failure to appear in connection with a previous charge of possession with intent to deliver. *Id.* at 21. Thus, police determined to take Raffle into custody. *Id.* at 11, 34.

Raffle was seen in both the Silver Kia and a Maroon Nissan over the course of the day, and both cars were observed being used in suspected drug activity. *Id.* at 12, 32, 48. Raffle left the hotel twice by car, the last time being around noon. *Id.* at 20, 22. Police, having decided to take Raffle into custody, waited at the surveillance site for the Kia and/or the Nissan to return.

The cars arrived together at the Motel 6 around 6:30 p.m., by which time it was dark outside. *Id.* at 22, 39-40, 48. Because it was dark outside and the parking lot was not well lit, the approaching officers used flashlights to illuminate the vehicles. *Id.* at 46. They announced that they were police. *Id.* at 47. As Detective Lavin approached the Nissan in plainclothes, he observed furtive movements from Appellant, who was in the passenger side back seat. *Id.* at 36, 47. Specifically, Appellant appeared to have trouble breathing when asked for identification, and his posture in his seat—specifically the way his body was laying across the seat—indicated to Detective Lavin, based on his experience, that Appellant was concealing something and thus potentially dangerous. *Id.* at 36-37. Police therefore removed Appellant from the vehicle, patted him down, and discovered the firearm. *Id.* at 38.

To summarize the foregoing, Appellant was present at the Motel 6, a common site for drug activity, and he was seen with Raffle at a time when police had been informed that Raffle would be selling drugs. By the time of Appellant's detention, police had seen Raffle use two different cars in furtherance of suspected drug transactions, and they had learned of Raffle's outstanding bench warrant. Appellant was observed in one of the cars involved in the suspected drug activity—the maroon Nissan. Appellant engaged in furtive movements upon seeing plainclothes officers approach. He had difficulty breathing when asked for identification and his posture in the car evidenced concealment of contraband and a potential threat.

In these circumstances, we find instructive our Supreme Court's analysis in *Zahir*:

> Here, the officers were investigating an allegation of narcotics trafficking and confronted Zhahir in an area known for drug activity at eight o'clock in the evening. Moreover, Zhahir's suspicious behavior appeared to have been in response to police presence and, when encountered, he turned to face the officer with his left hand in his pocket. As noted, Officer Singletary testified that his subsequent actions were based on a concern that Zhahir might be retrieving a weapon from his pocket; in view of the immediacy of the situation confronting the officer, common sense dictates that preference be given to his personal safety.

*Zhahir*, 751 A.2d at 1158.

Considering the totality of the circumstances, and drawing reasonable inferences from the facts, we conclude that the record supports a finding that police had both reasonable suspicion to believe that illicit drug activity was afoot, and that Appellant, given his posture and furtive movements upon being approached, was potentially dangerous. Here, as in *Zahir*, common sense dictates that preference be given to the safety of the investigating police officers. We discern no error in the trial court's conclusion that the detention and pat down search were lawful.

Finding no merit to the only argument Appellant presents on appeal, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/14/2026